Nathaniel WALLACE, Jr., Petitioner,

v.

Arthur LEONARDO, Superintendent
of Great Meadow Correctional
Facility, Respondent.

No. 92–CV–469A.

United States District Court,
W.D. New York.

June 30, 1993.

Howard K. Broder, Rochester, NY, for petitioner.

Andrew Lipkind, Asst. Atty. Gen., Buffalo, NY, for respondent.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

This petition for habeas corpus relief was referred to the undersigned by the Hon. Richard J. Arcara pursuant to 28 U.S.C. § 636(c), and the consent of the parties, for all further proceedings. For the reasons set forth below, the petition is dismissed in its entirety.

## BACKGROUND

On October 5, 1978, Petitioner Nathaniel Wallace was found guilty by a Wyoming County Court jury of the rape and murder of Nancy Vial, a civilian cook at the Attica

1. References preceded by the letter "T" are to the trial transcript, submitted as part of the state court records.

Correctional Facility. The trial lasted three and a half weeks, during which the jury heard testimony from thirty-four witnesses. One witness, inmate William Tompkins, testified that Petitioner confessed to him of having committed both crimes (T. 1359–67).[1] Another witness, inmate Anthony Liccione, testified that Petitioner confessed to him of having "killed ... a bitch" (T. 1830, 1853). The trial court entered judgment on the convictions on December 19, 1978.

Almost twelve years later, on March 16, 1990, the convictions were unanimously upheld on appeal. *People v. Wallace*, 159 A.D.2d 1022, 552 N.Y.S.2d 723 (4th Dept. 1990) (mem.) (affirming judgment of conviction on murder charge); *People v. Wallace*, 159 A.D.2d 1032, 555 N.Y.S.2d 639 (4th Dept. 1990) (mem.) (affirming judgment of conviction on rape charge). On June 6, 1990, leave to appeal was denied by the Court of Appeals. *People v. Wallace*, 76 N.Y.2d 798, 559 N.Y.S.2d 1003, 559 N.E.2d 697 (1990).

While the appeal was pending, Petitioner brought a motion to vacate the conviction under N.Y.C.P.L. § 440 (the "§ 440 motion") on February 6, 1984. An evidentiary hearing was held on continuing dates in 1987 and 1988, but no decision on this motion has been rendered.

On November 21, 1989, Petitioner also moved for a writ of error *coram nobis*. On December 8, 1989, this motion was denied by the Appellate Division.

Additionally, on January 31, 1983, Petitioner brought a habeas corpus petition in the United States District Court for the Northern District of New York. The petition alleged that his constitutional right to a direct appeal was violated as a result of the State's failure to provide him with a transcript of the trial, and his assigned attorney's failure to prosecute the appeal. On June 22, 1983, the district court dismissed the petition as moot based on information that Petitioner had been supplied with the necessary records. *Wallace v. LeFevre*, No. 83–CV–177 (N.D.N.Y.1983). On September 6, 1983, the

Second Circuit denied a certificate of probable cause.

Petitioner filed the instant petition on July 22, 1992, asserting the following three grounds for habeas corpus relief pursuant to 28 U.S.C. § 2254:

1. that the prosecuting attorney at trial violated his rights of due process and equal protection by appealing to religious prejudice during the cross-examination of defense witness "Brother Vincent;"

2. that comments by the trial judge and prosecuting attorney during trial impermissibly shifted the burden of proof; and,

3. that he was denied due process and effective assistance of counsel as a result of delay in appellate review of his 1978 murder and rape convictions.

Each of these grounds was raised on Petitioner's direct appeal to the Appellate Division, as well as in his application for leave to appeal to the New York State Court of Appeals.

## DISCUSSION

### I. Appeal to Religious Prejudice.

■ During cross-examination of defense witness Vincent ("Brother Vincent") Jenkins, the following colloquy took place:

Q. ... Now, on the night of the crime, August 5th, 1977 were you questioned then?

A. Was I questioned?

Q. Yes.

A. Yes they took us through a few questions.

Q. Did you give them any information then?

A. No.

Q. Now you are a member of the religious community of Islam, correct?

A. That's right.

Q. Would it be fair to say that people generally in that religious sect do not cooperate with the police?

(T. 1571). Before the witness answered, defense counsel objected, and the prosecuting attorney rephrased the question as follows:

Q. Let me rephrase it. Is there something about the fact that you are a member of the religious organization, the Islams, that would make you hesitate to give information to the police or prison officials?

A. No, sir.

Q. Is there any particular reason you wouldn't tell them that night?

A. Of course, I wanted to go home.

Q. You were in line to go home?

A. Yes.

Q. And you felt it would interfere with your going home?

A. Right.

(T. 1572–73).

Petitioner claims that this questioning by the prosecuting attorney, along with the testimony of prosecution witness Gary Lee Stone that he heard Petitioner pronounce the name of a religious newspaper (T. 1259, 1313–14), violates the due process and equal protection clauses of the United States Constitution since it sought to discredit the Petitioner's defense case through an appeal to religious prejudice.

In his appeal to the Fourth Department, Petitioner argued that the prosecutor's cross-examination of Brother Vincent constituted prosecutorial misconduct because the jury was allowed to discredit Brother Vincent's crucial testimony on the basis of his religious beliefs (E. 16–21).[2] The Fourth Department held:

Although we conclude that such inquiry should not be countenanced, in the instant case the error was harmless in view of the overwhelming proof of defendant's guilt and the unlikelihood that a different result would have been reached but for the error.

*People v. Wallace,* 159 A.D.2d 1022, 1022, 552 N.Y.S.2d 723, 724 (4th Dept.1990) (citing *People v. Wood,* 66 N.Y.2d 374, 379–80, 497 N.Y.S.2d 340, 488 N.E.2d 86 (1985); *People*

---

**2.** References to "E" are to Exhibits submitted by Petitioner in support of the petition.

v. *Crimmins,* 36 N.Y.2d 230, 241–42, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975)).

Generally, federal courts reviewing habeas corpus claims premised upon prosecutorial misconduct must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974); *see also Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990). In making this distinction, the harmless error doctrine applies, and the court should consider whether "there was such clear evidence of guilt that the prosecutor's remarks must be considered harmless." *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986). Constitutional error occurs only when the remarks by the prosecutor are so prejudicial that they render the trial fundamentally unfair. *Id.; Donnelly v. DeChristoforo, supra,* 416 U.S. at 645, 94 S.Ct. at 1872.

Citing *U.S. ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973), Petitioner argues that any statements by the prosecutor reflecting racial prejudice require "automatic reversal" and that the harmless error doctrine does not apply. In *Haynes,* the Second Circuit affirmed the district court's grant of a writ of habeas corpus based on prejudicial remarks made by the prosecution during a state court robbery trial. There, in his summation to an all-white jury, the prosecutor repeatedly referred to characteristics and behavior of "colored people" in such a way as to suggest that the jurors "view 'colored people' as an entity separate and apart from themselves, with the natural concomitant that the defendants would be viewed by the jury members as coming from a distinct, . . . different community from themselves." 481 F.2d at 160. According to the Second Circuit, such conduct on the part of the prosecuting attorney amounted to constitutional error under either a federal or state law analysis, since "the standard for state prosecution in this regard is . . . as high as the rigorous standard required of the federal courts by the fifth amendment's due process clause." *Id.* at 159.

The Second Circuit in *Haynes* qualified its holding, finding that at least "when the evidence of guilt . . . is not overwhelming," the correct test for determining whether a defendant's due process or equal protection rights were violated by a prosecutor's allegedly racially prejudicial remarks is whether those remarks resulted in a "probability of prejudice." *Id.; United States v. Weiss,* 930 F.2d 185, 196 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991). The *Haynes* court did not extend the test to cases such as this, where the evidence of guilt was overwhelming.

■ Therefore, I find that the correct standard to be applied here is one of harmless error, not "probability of prejudice." *See, e.g., Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967) (question for the court is whether, on the record as a whole, it is beyond a reasonable doubt that the evidence complained of did not contribute to the verdict obtained).

In conducting harmless error analysis to determine whether a prosecutor's conduct has substantially prejudiced the defendant's case, the Second Circuit has applied a three-fold test. The factors include: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *Garofolo v. Coomb, supra,* 804 F.2d at 206.

In the instant case, as the Appellate Division noted, the conduct of the prosecutor "should not be countenanced," *People v. Wallace, supra,* 159 A.D.2d at 1022, 552 N.Y.S.2d at 724, but it nevertheless was not severe. It consisted of brief questioning regarding a defense witness's religious beliefs and whether those beliefs might have caused the witness to refrain from cooperating with the official investigation of the murder. Upon objection to the inference that members of the Islam faith generally do not cooperate with the police, the prosecuting attorney rephrased the question so as to inquire whether that particular witness's membership in the Islam faith had anything to do with his refusal to cooperate with police in the investigation of the Vial homicide. Defense counsel

did not object to this question as rephrased. Neither side mentioned this reference in their summation, nor was any other religious reference made by the parties or the judge during the remainder of the trial.

Furthermore, the conduct was cured by defense counsel's objection and by the rephrased question. The witness's answer to the rephrased question provided a plausible explanation for his refusal to cooperate which was free from the taint of any religious or racial prejudice—namely, that he was scheduled to be released from prison soon, and he was concerned that his participation in the investigation might interfere with his release.

Finally, "there was such clear evidence of guilt" that the prosecutor's conduct did not render the trial fundamentally unfair. *Garofolo v. Coomb, supra*, 804 F.2d at 206. The Fourth Department found the evidence of Petitioner's guilt "overwhelming." *People v. Wallace, supra*, 159 A.D.2d at 1023, 552 N.Y.S.2d at 724. That evidence included testimony concerning Petitioner's detailed confession of the crime to another Attica inmate (T. 1359–67, 1418, 1428–29); Petitioner's inculpatory statement on the afternoon of the crime (T. 1830, 1853); testimony that Petitioner and Ms. Vial were observed together in the area where the crime took place (T. 136–37; 1102); testimony that Petitioner was observed coming out of the cooler where Ms. Vial's body was found, with messy hair and bloody pants (T. 144–46; 279–81; 1105–06; 1165–66); testimony that Petitioner was observed immediately thereafter washing his face (T. 148–49; 327), showering and changing his clothes (T. 1107; 1170–71); testimony that Petitioner was nervous and jittery at "the count" in the mess hall shortly after the incident, and was observed to have blood on his shoes and in his ear (T. 1258–59); and evidence including a blood-stained shirt and blood-stained pants bearing Petitioner's name, which were found by a state police investigator beneath a locker in the basement (T. 678–79).

■ Petitioner also complains about the prosecutor's conduct during direct examination of prosecution witness Gary Lee Stone. In response to the prosecutor's questioning, the witness stated that he heard Petitioner pronounce the name of a religious newspaper, which was printed in a foreign language (T. 1259). Petitioner claims that this line of questioning raised an inference in the juror's minds that Petitioner was a member of the Islam faith. However, in light of the clear weight of evidence of Petitioner's guilt discussed above, any error resulting from the prosecutor's conduct was harmless.

Accordingly, under the standards set forth above, the conduct of the trial was not so unfair as to result in a violation of due process or equal protection.

## II. Burden of Proof.

Petitioner contends that both the prosecuting attorney and the judge made comments which impermissibly shifted or diminished the people's burden of proof to establish guilt beyond a reasonable doubt.

■ In his charge to the jury, the trial judge discussed circumstantial evidence as follows:

> Circumstantial evidence is the grouping of facts in such a manner that you may draw an inference from these facts in such a way that you may find a safe road to the truth. Before you can rely on circumstantial evidence, it first must all point in one direction. If it points in both directions, it is your duty to favor innocence. In other words, if circumstantial evidence merely creates a suspicion or likelihood of guilt, it is insufficient to warrant a conviction. It must point only in the direction of guilt. You cannot use circumstantial evidence to draw one inference and then draw another inference from the same set of facts. Subject to these rules, there is no reason why you would be reluctant to determine guilt or innocence in this case on circumstantial evidence. It must, however, be clear and convincing.

(T. 1963–64). Petitioner contends that this charge violates due process because it created in the juror's minds the possibility that, as a special category of proof, circumstantial evidence carries with it its own "clear and convincing" standard which is less than proof beyond a reasonable doubt.

This argument was rejected by the Appellate Division. That court found the trial court's reference to the "clear and convincing" standard "to be harmless error in view of the overwhelming proof of the defendant's guilt." *People v. Wallace, supra,* 159 A.D.2d at 1023, 552 N.Y.S.2d at 724. The court further stated:

> Moreover, we find that the court's charge, when considered as a whole, conveyed the proper standard of proof to the jury. Further we note that since there was direct evidence of a full confession made by the defendant to a fellow inmate, the circumstantial evidence charge need not have been given at all.

*Id.* (citations omitted).

In *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), the Supreme Court reaffirmed "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Here, in his charge to the jury, the trial judge repeatedly referred to the prosecutor's burden to prove guilt beyond a reasonable doubt (T. 1957–59, 1968, 1969). In context, the judge's single instruction to the jury that they must find the circumstantial evidence to be "clear and convincing" does not rise to the level of constitutional error.

■ Petitioner also claims that the prosecutor improperly shifted the burden of proof to require Petitioner to prove his innocence. The prosecuting attorney cross-examined Petitioner in such a manner as to attempt to get Petitioner to characterize previous prosecution witnesses as "liars" (T. 1756–57; 1785–86; 1794; 1795; 1802; 1804). He also remarked during summation that, in order for the jury to find Petitioner innocent, they must believe that the prosecution witnesses were all lying (T. 1955–56). Finally, he referred to the trial as a "search for truth" (T. 1928).

This claim was likewise presented and rejected on appeal. The Fourth Department stated:

> There is no merit to defendant's contention that he was denied a fair trial by the prosecutor's repeated effort to force the defendant to characterize the People's witnesses as liars and by his reference in summation that the trial was a "search for the truth." We do not find the prosecutor's remark made in summation to be prejudicial, since it did not reflect directly on the burden of proof. Although the prosecutor's attempt to force the defendant to characterize the People's witnesses as liars was error, it is harmless in view of the overwhelming proof of defendant's guilt and the ameliorative effect of the length of the trial.

*People v. Wallace, supra,* 159 A.D.2d at 1023, 552 N.Y.S.2d at 724 (citations omitted).

■ A criminal conviction should not be overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding. *Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). In order to result in a constitutional violation, a prosecutor's remarks must "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo, supra,* 416 U.S. at 643, 94 S.Ct. at 1871. In making this determination, the court is guided by the factors set forth in *United States v. Modica, supra,* 663 F.2d at 1181, as discussed above in the context of analyzing the constitutional implications of the prosecutor's alleged introduction of religious or racial prejudice into the case. *See Gonzalez v. Sullivan, supra.*

Here, the prosecuting attorney's conduct was not prejudicial. For one thing, the prosecuting attorney engaged in the method of cross-examination of which Petitioner complains after defense counsel had earlier employed the exact same tactic in his cross-examination of prosecution witness Stone (T. 1264–70). Moreover, any shifting or dilution of the burden which might have resulted from the prosecutor's conduct was cured by the trial judge's repeated references in the jury charge to the proper burden of proof in a criminal case. Finally, as discussed above, the proof of guilt presented to the jury was so overwhelming that conviction was certain even without the prosecutor's attempts to shift the burden.

### III. Delay of Appellate Review.

■ Petitioner contends that the period between his conviction on December 19, 1978 and the decision of his appeal on March 16, 1990 constitutes impermissible delay in violation of due process. Respondent argues that virtually all of the delay is attributable to Petitioner's assigned counsel's decision to proceed with the § 440 motion before perfecting the appeal.

The Appellate Division considered and rejected Petitioner's argument based on lack of prejudice resulting from the delay. *People v. Wallace, supra,* 159 A.D.2d at 1023, 552 N.Y.S.2d at 724 (citations omitted).

■ In determining whether delay of a prisoner's appeal violates due process, the court must look to the same criteria used in evaluating pre-trial delay, including the length of the delay, the reasons for the delay, the petitioner's assertion of his or her rights, and prejudice. *Barker v. Wingo,* 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972); *see also Cody v. Henderson,* 936 F.2d 715, 722 (2d Cir.1991); *Simmons v. Reynolds,* 898 F.2d 865, 868 (2d Cir.1990); *Gimenez v. Leonardo,* 702 F.Supp. 43, 45–46 (E.D.N.Y.1988). No one factor is dispositive, and all are to be considered together with the relevant circumstances. *Simmons v. Reynolds, supra,* 898 F.2d at 868.

Regarding the length of the delay, the 11–year, 3–month period from the filing of the notice of appeal to the Fourth Department's unanimous affirmance of the judgment of conviction was clearly excessive. However, the Second Circuit has recently rejected the application of a *per se* rule for ordering habeas corpus relief based on delay in hearing the petitioner's state court appeal. *Muwwakkil v. Hoke,* 968 F.2d 284 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992). There, the Court held that the petitioner, whose appeal took 13 years, had been denied his right to a speedy appeal, noting that it had recently found an 8½–year delay excessive. *See Elcock v. Henderson,* 947 F.2d 1004 (2d Cir.1991). However, the Court refused to order habeas relief in the absence of a showing of prejudice *to the appeal,* and required the petition-

er to demonstrate "a reasonable probability that, but for the delay, the result of the appeal would have been different...." *Muwwakkil v. Hoke, supra,* 968 F.2d at 285 (quoting *Mathis v. Hood,* 937 F.2d 790, 794 (2d Cir.1991)).

Here, Petitioner has failed to show that his appeal was prejudiced by the delay. The Fourth Department relied on the record, which was the same in 1990 as it was in 1978, for its findings of harmless error. Thus, even though the lapse of time may have prejudiced Petitioner's ability to locate a key witness to testify for the purposes of the hearing on his § 440 motion, it did not prejudice Petitioner's appeal since the Appellate Division found the record as it stood to contain overwhelming proof of guilt.

However, while this Court cannot order Petitioner's release pursuant to a writ of habeas corpus in the absence of a showing that the result of the appeal would have been different but for the delay, a review of the remaining *Barker v. Wingo* factors suggests that some type of relief is appropriate.

The record reflects the following facts and events pertaining to the reasons asserted for the delay. On December 19, 1978, a notice of appeal was filed on Petitioner's behalf by his trial attorney, James A.W. McLeod, Esq. (E. 65). On December 28, 1979, Petitioner filed an affidavit for leave to proceed *in forma pauperis* on the appeal, and for assignment of appellate counsel (E. 66). On January 16, 1980, the Appellate Division, Fourth Department, granted the application, and assigned Mark J. Mahoney, Esq., to conduct the appeal (E. 77).

By letter dated September 23, 1982, Petitioner complained to the Appellate Division that Mr. Mahoney "has done nothing for me or in my behalf since you have assigned him to me ...," and asked the court to assign him another appellate attorney (E. 78). The court responded by notifying Petitioner that his letter had been forwarded to Mr. Mahoney (E. 80).

Meanwhile, Mr. Mahoney had written a letter to Petitioner dated September 20, 1982, which reached Petitioner after he had

sent his September 23 letter to the Appellate Division. In his September 20 letter, Mr. Mahoney informed Petitioner that work had not proceeded on the appeal since he was waiting for the Wyoming County Court to forward him a copy of the trial transcript (E. 83). Mr. Mahoney also stated that he had no basis to request the transcript from Mr. McLeod (who apparently had a copy) since Mr. Mahoney had been assigned to conduct the direct appeal and not to represent Petitioner on a potential § 440 motion (*id.*).

At the time of trial, Mr. McLeod, Petitioner's trial counsel, had been associated with the same law firm as Mr. Mahoney. However, in September, 1982, Mr. McLeod was no longer with that firm.

In the September 20, 1982 letter, Mr. Mahoney indicated that he would have been able to obtain the transcript from Mr. McLeod, and therefore would not have needed to wait for the transcript from Wyoming County, if Petitioner had paid Mr. McLeod as promised. As Mr. Mahoney stated: "Indeed, I can recall on many occasions being assured by you and your wife that Mr. McLeod was going to be compensated when we were first considering appellate strategy, and whether to proceed with a 440 motion first" (*id.*).

In October, 1982, Petitioner applied to the state court for a writ of habeas corpus on the grounds that the state court's failure to provide transcripts, and his counsel's failure to process his appeal, resulted in a denial of due process (E. 185–191). This petition was denied by the Appellate Division, Third Department, on November 16, 1982 (E. 193), and leave to appeal was denied by the Court of Appeals (E. 194).

Thereafter, on December 28, 1982, Petitioner filed a motion *pro se* for an order under N.Y.C.P.L.R. § 5104 requiring the Clerk of the Fourth Department to file the trial transcript and provide a copy to his appellate counsel (E. 86–88). On January 18, 1983, the court notified Petitioner that his motion was unnecessary since the transcript had been filed with the Clerk (E. 90).

On January 31, 1983, Petitioner applied for a writ of habeas corpus to the United States District Court for the Northern District of New York on the same grounds as asserted in his state court habeas petition (E. 195–205). On June 22, 1983, the District Court dismissed the petition as moot on information that the records had been supplied and Petitioner's appeal was proceeding in state court. *Wallace v. LeFevre*, No. 83–CV–177 (N.D.N.Y.1983) (Port, J.) (E. 209–210).

On February 6, 1984, Petitioner filed his § 440 motion *pro se* (motion dated December 9, 1983) (State Court Records, Folder # 5).

By letter dated February 25, 1985, Petitioner requested that the Appellate Division assign him a new appellate counsel, since Mr. Mahoney had done nothing on either his appeal or his 440 motion (E. 95–96). The court responded with a note dated March 11, 1985, which stated that Mr. Mahoney "has advised the Court that he has submitted a [§ 440] motion to vacate the judgment of conviction in the Wyoming County Court which is being pursued along with the appeal" (E. 97).

Petitioner wrote another letter to the court on July 10, 1985, again complaining that he had heard nothing concerning his appeal (E. 98). The court responded by letter dated July 16, 1985, stating:

> The attorney assigned to your appeal has recently contacted the court and informed it that he has filed a [§ 440] motion to vacate your conviction in Wyoming County Court. He has not received a decision yet. He is also proceeding with the appeal which he stated will be filed shortly.

(E. 101).

On November 3, 1985, Petitioner moved to dismiss Mr. Mahoney as his appellate counsel (E. 102–104). On November 14, 1985, the court advised Petitioner that this motion could be considered only if he sent copies of the motion to the District Attorney and to Mr. Mahoney (E. 109).

Thereafter, on November 16, 1987, Mr. Mahoney wrote to Carl M. Darnall, Deputy Clerk of the Appellate Division, explaining that it was his understanding that he had been assigned by the Wyoming County Court to represent Petitioner on the [§ 440] motion, as well as on the direct appeal (E. 110–11). He also explained that substantial delay

was encountered in preparation for the hearing on the § 440 motion because of the unavailability of a crucial witness, and that it was in the interest of judicial economy to wait for a disposition of the § 440 motion before proceeding with the appeal (*id*). The § 440 motion was heard by the Wyoming County court on October 1 and 2, 1987, July 6; 1988 and October 11, 1988 (State Court Records, Folder # 6).

In a letter to the Appellate Division dated November 22, 1988, Mr. Mahoney stated that Petitioner was "in complete agreement with" the strategy of completing the § 440 motion before proceeding with the direct appeal (E. 114).

On September 5, 1989, Petitioner wrote to the Appellate Division, again requesting that a new attorney be assigned to his appeal (E. 117–18). By order dated September 22, 1989, the Appellate Division assigned Howard K. Broder, Esq., to conduct the appeal, and placed the case on the calendar for the January, 1990 term (E. 122). Mr. Broder filed his brief on behalf of Petitioner on December 14, 1989. Upon consideration of the merits of the appeal, the judgments of conviction were unanimously affirmed by the Appellate Division in its March 16, 1990 memorandum order.

Petitioner first asserted his right to a speedy appeal in his September 23, 1982 letter in which he complained to the court that Mr. Mahoney had not processed his appeal or communicated with him since his assignment in January of 1980 (E. 78). His several letters to the court and to counsel, as well as efforts made on his part by family members, are evidence of active and diligent pursuit of his appeal rights.

It is evident from the record that, as of September, 1982, Mr. Mahoney had made various attempts to procure the trial transcripts from the clerk of the Wyoming County Court, and had communicated to Petitioner his efforts and his suggested strategies for proceeding with the appeal (E. 82, 83). It is also evident from that correspondence that Petitioner had, at some point prior to January, 1980, discussed with his trial counsel the strategy of proceeding first with the § 440 motion before perfecting the appeal, and that

Mr. McLeod was prepared to proceed with that motion upon being paid for his representation of Petitioner at his murder trial. Therefore, much of the delay in the appellate review of Petitioner's conviction may be attributed to his counsel's conduct in processing the appeal.

However, at least some if not a substantial portion of the delay can be attributed to the state's apparent failure to provide requested transcripts on a timely basis, failure to supervise its appointed counsel and monitor its appeals calendar (*see, e.g., Muwwakkil, supra,* 968 F.2d at 285), and failure to heed or honor Petitioner's several requests for assistance with his appeal.

■ Upon consideration of all of the circumstances under the standards outlined above, the 11–year 3–month delay was excessive. However, in the absence of a showing of prejudice, this Court cannot grant Petitioner "dismissal of a criminal charge on which he was properly convicted, a right he does not have." *Simmons v. Reynolds, supra,* 898 F.2d at 869. Instead, the Court can only "allow [Petitioner] to pursue other remedies which may be available to him." *Muwwakkil v. Hoke, supra,* 968 F.2d at 286. Accordingly, the appropriate remedy is to grant leave to amend the petition to recast it as a complaint for damages based on a violation of his right to speedy appeal under 42 U.S.C. § 1983. *See Cody v. Henderson, supra,* 936 F.2d at 723; *Simmons v. Reynolds, supra,* 898 F.2d at 870. In granting this remedy, this Court "express[es] no views on who might be appropriate defendants, whether any defendants who acted under color of state law are entitled to immunity, or any other aspect of the merits" of such a complaint. *Simmons v. Reynolds, supra* at 869.

## CONCLUSION

Based on the foregoing, the petition for habeas corpus is dismissed in its entirety, without prejudice to refile as a complaint for damages under 42 U.S.C. § 1983 based on the 11–year 3–month delay in the disposition of Petitioner's direct appeal from his state court judgment of conviction.

Because Petitioner has made a substantial showing of the denial of a federal right, a certificate of probable cause is granted pursuant to 28 U.S.C. § 2253. *Lozada v. Deeds,* 498 U.S. 430, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991); *Grune v. Coughlin,* 913 F.2d 41 (2d Cir.1990).

**SO ORDERED.**